J-S29015-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: T.N.M., III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 632 MDA 2023 |

Appeal from the Order Entered March 29, 2023
In the Court of Common Pleas of York County
Juvenile Division at 2022-0180a, CP-67-DP-0000122-2014

| | | |
|---|---|---|
| IN THE INTEREST OF: T.N.M., III, A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 635 MDA 2023 |

Appeal from the Decree Entered March 29, 2023
In the Court of Common Pleas of York County
Orphans' Court at No. 2022-0180a

BEFORE:   MURRAY, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY MURRAY, J.:          **FILED: OCTOBER 10, 2023**

N.B. (Mother) appeals from the decree terminating her parental rights to T.N.M., III (Child), and the order changing Child's permanency plan to concurrent goals of adoption and "placement with a legal custodian

_____

[*] Retired Senior Judge assigned to the Superior Court.

(relative)."[1]  Order, 3/29/23.  Upon review, we affirm the termination decree, and dismiss the appeal from the goal change order.

Child was born in May 2014.  The orphans' court explained:

[Mother] is currently incarcerated at SCI Cambridge Springs. Testimony established that including her current incarceration, she's had a total of seven [driving under the influence (DUI)] convictions in her life.

As a result of those DUI convictions during [C]hild's life, [Mother] has been incarcerated for a little less than seven years of the [C]hild's eight plus years of life.

Records established that [Mother] was incarcerated shortly after [C]hild was born in 2014, through February 1st, 2019, just under five years.  She was reincarcerated for a subsequent DUI in June of 2021 and remains incarcerated at this time.

N.T., 3/28/23, at 7.

Child was adjudicated dependent, for the second time, in July 2021.[2] N.T., 2/6/23, at 21.  Child has resided with his paternal aunt, C.M., since May 2021.  N.T., 3/28/23, at 8.  C.M. is a long-term placement for Child, but is not an adoptive resource.[3]

On November 7, 2022, the Agency filed a petition to terminate Mother's parental rights; the Agency also filed a motion to change Child's permanency goal from reunification to adoption.  The orphans' court held hearings on

---

[1] The court also terminated the parental rights of T.N.M., Jr. (Father), who has not appealed.

[2] Child "was previously [adjudicated] dependent in June of 2014."  N.T., 2/6/23, at 44.

[3] The record is unclear as to why C.M. is not an adoptive resource for Child.

February 6 and March 28, 2023. Child was represented by Attorney Sydney Benson, as guardian *ad litem* (GAL), and Attorney Brandy Hoke, as legal counsel. ***See*** N.T., 2/6/23, at 4. Mother participated remotely from SCI Cambridge Springs. ***Id.*** at 8.

EVIDENCE

At the first day of hearing, the orphans' court "incorporated the entire dependency record … into the orphans' court proceeding." ***See*** N.T., 3/28/23, at 107-08. The court "also, without objection, took judicial notice of all motions, orders, and applications … in the dependency action as part of the orphans' court proceeding." ***Id.*** at 108.

The Agency presented testimony from caseworker Jason Thompson, who had been involved with the family since June 2021. N.T., 2/6/23, at 19. Mr. Thompson described Child as a typical eight year old boy. ***Id.*** at 41. He stated that Child "does well, overall" in school, and "has actually made improvements." ***Id.*** at 40. Mr. Thompson testified to making referrals for services for Child, and conducting "home visits every approximately 90 days just to check in on the status." ***Id.*** at 18-19. He noted that family service plans were issued on July 29, 2021, May 20, 2022, July 8, 2022, and December 15, 2022. Recognizing that Mother had been incarcerated throughout Child's dependency, Mr. Thompson explained that Mother "was going to need to participate in a drug and alcohol evaluation, she was going to need to participate in drug and alcohol testing, and she was going to need to participate with a parenting class …."

Mother's counsel had introduced into evidence "four certificates of completion for various treatment programs which [M]other had completed while at SCI Cambridge." *Id.* at 11 (Exhibits 1-4). However, Mr. Thompson testified that the Agency did not receive documentation that Mother "participated in any programs while at Cambridge Springs prior to January 2023," which "was the first time that the Agency received documentation of [M]other's participation in some type of program while incarcerated …." *Id.* at 27. *See also id.* at 40 (Mr. Thompson stating Mother had not "effectively availed herself of services … to have [C]hild returned to her care and custody.").

Mr. Thompson testified that Child did not visit Mother in person, although Child and Mother "were in contact by video or phone … one to two times a week."[4] *Id.* at 32-33. Mr. Thompson stated, "From what I understand, the contact is positive." *Id.* at 35. According to Mr. Thompson, "other than the consistent video or phone contact," Mother has not performed any parental duties or obligations. *Id.* at 38-39. Mr. Thompson opined that Mother's incapacity has caused Child to be without essential parental care, and Mother is not in a position to care for Child. *Id.* at 39.

Regarding Child's long-term placement with his paternal aunt, C.M., Mr. Thompson stated:

---

[4] There was an eight-month delay in establishing Mother and Child's visits by Zoom. N.T., 2/6/23, at 59.

- 4 -

[C]hild is comfortable in the home and well bonded with the resource parents. [T]he resource parents have a child who is right at the same age as [C]hild and they get along well, overall. [C]hild is doing well in school there. And so he is settled in very well. He is very active within the home. He has also been active in various activities.

*Id.* at 34.

The Agency's counsel asked Mr. Thompson:

Q. And, based upon your review of the file and interaction with the family, does the stronger bond lie with the resource family or with [M]other, or is it neutral?

A. At this time I would definitely say the bond is stronger with the resource family.

*Id.* at 36. Mr. Thompson based his conclusion specifically on "how well [Child] settled into the [resource] home and the extensive amount of time he has remained there." *Id.* at 46.

The Agency's counsel also asked Mr. Thompson:

Q. And does the [A]gency believe it is in the best interest of the [C]hild to change the goal?

A. Yes.

Q. And what does the [A]gency believe the appropriate goal should be?

A. Adoption.

Q. And why does the [A]gency believe it is in the best interest of [C]hild to change the goal?

A. So that [C]hild can find permanency moving forward ….

Q. Is [M]other … in a position today to obtain physical custody of the [C]hild?

A. No.

Q. Does there continue to be an appropriateness for and necessity of the placement of the [C]hild outside the care and custody of [M]other []?

A. Yes.

Q. Has [M]other made any progress towards alleviating the circumstances which necessitated the original placement, other than serving her previously imposed sentence?

A. No.

*Id.* at 36-37.

Mr. Thompson further testified that the Agency had identified a couple as a pre-adoptive resource for Child.[5] *Id.* at 41. He added that termination was in Child's best interest so Child "can achieve permanency with the resource parents who are willing to be an adoptive resource." *Id.* at 42. Although Mr. Thompson agreed there was a bond between Mother and Child, he opined there would be "no long-term negative impact" to Child if Mother's parental rights were terminated.[6] *Id.* at 42, 47.

---

[5] Mr. Thompson did not expand on the "resource parents who were willing to be an adoptive resource." *Id.*

[6] On cross-examination, Mother's counsel asked Mr. Thompson his "basis for determining the impact of termination," when Mr. Thompson, "had not had these conversations with [C]hild?" *Id.* at 66. Mr. Thompson responded, "like I said, [C]hild's interactions and comfort level in the [resource] home. There was one particular situation I was informed of where [C]hild actually made the comment where he thought he already was adopted and part of the family." *Id.*; *see id.* at 85-86 (Mr. Thompson testifying that Child made the comment in September 2022).

Before the first day of hearing concluded, the Agency's counsel indicated it might be necessary for C.M., Child's "resource parent," to testify. N.T., 2/6/23, at 89. The orphans' court responded:

> The court thinks that it is going to be necessary because the court may have some questions for the resource parents[, C.M. and her husband,] or other counsel given what we have heard so far today. So we will plan on [the] kinship parent being called.

*Id.* at 89-90.

The parties convened for a second day of testimony approximately six weeks later. Initially, the Agency recalled the caseworker, Mr. Thompson. Counsel for the Agency asked:

> Q.    And in regard to [C]hild, how are things going with him?
>
> A.    [C]hild has been struggling up and down at times. He's -- his behaviors will fluctuate in the home. He will sometimes be doing very well, you know. He has lots of friends in the area, so he can be doing well, going outside interacting with them.
>
>      He can be very pleasant in the home, have good interactions … but then other times if he gets frustrated about something, he can also have outbursts that can at times even get somewhat physical and destructive.
>
>      When I just saw him on March 16th in the home, I had a conversation with him just to sort of try and gauge where he was at with his feelings on, you know, the current circumstances. He seemed to understand, you know, sort of what was going on.
>
>      I asked him about how he felt with where he was living. He was comfortable …. He did voice that he missed seeing his older brother as well as his [maternal aunt,] Aunt Christy, who [the Agency] previously attempted to have visits with [Child]. But due to some restrictions we had in place with drug testing and things, she did not fully cooperate at times, so those visits kind of fell off.

I know [C.M. has] always been very open to try and allow him to have contact with family. When I spoke with [C.M.] about [C]hild's brother, she said they do have contact sometimes, but it can be difficult to get in touch with the brother just based on … what he has going on. I guess he has a new significant other, so it just depends on … his schedule, but they are very open to him having a relationship with [C]hild.

N.T., 3/28/23, at 9-11.

Mr. Thompson added:

[W]hen I was at [C.M.'s] home recently, I was asking about how visits were going with [M]other, the [Z]oom visits, because [Child] has them weekly, that the interactions can fluctuate.

Some of the visits go really well. Sometimes [Child] doesn't want to complete the visits because he wants to go out and spend time with his friends, which … from what I understand can be frustrating for [Mother].

And so depending on how those interactions go … there can be … some frustration on him. But from what I understand in general, their interactions are positive and go okay during the visits.

*Id.* at 12.

According to Mr. Thompson, Child

understands where things are at as far as … moving toward adoption and the process we're in with this becoming a more long-term situation of him staying with [paternal] aunt and uncle. And that's why I wanted to speak with [Child] about [whether he] was comfortable in that home and was he okay with staying there as an option because of what I've been hearing about [Child's] behaviors and things like that.

And that's when [Child] told me that, yes, he was comfortable there, but then he also expressed that he missed his brother, he missed his Aunt Christy, but he didn't actually state to me I don't want to live here, I want to live here[.] It was just simply that he wanted to see them more. And I spoke with [paternal aunt, C.M.,] about that ….

- 8 -

I asked [Child] about adoption. He kind of fluctuates on it. I've talked to him twice now about it. The first time he seemed very open to it, and that was back I think towards the very beginning of December.

And when I spoke to [Child] on the 16th, like I said, he seemed very content about staying where he was. But as far as the concept of adoption, he wasn't really giving me a straight answer. He just kept talking about how he was happy where he was and about missing his brother and his [maternal] aunt and he mentioned his old school at one point. So like I said, he didn't really state yes or no one way.

*Id.* at 18-19.

Child's aunt, C.M., testified that Child visits with Mother by Zoom once a week for 45 minutes. *Id.* at 31-32, 42. Although she is not a pre-adoptive resource, C.M. is willing to continue to care for Child. *Id.* at 33. She relayed that Child has adjusted well in her home. *Id.* at 34. C.M. further testified that Child

understands [Mother is incarcerated]. He sees her on the video chat. … He knows that's where she's at. He knows that's why he's in this situation. And as far as the adoption goes, he understands it. He understands that [his family has] … been dealing with [the Agency] for about two years now and that, unfortunately, something has to happen and this is where we're at and his parents are unable to care for him ….

*Id.* at 47-48.

C.M. stated that Child understands "adoption would mean that he would be taken in as a child to someone else." *Id.* at 48. She explained, "It doesn't make him the happiest, but he understands it." *Id.*

Mother testified remotely from prison. She confirmed she has been incarcerated since June 17, 2021. N.T., 3/28/23, at 67, 94. Mother also confirmed that in the past ten years she had three DUI convictions, and a total of seven DUIs overall. *Id.* at 89, 94. She stated that her longest period of sobriety "on the street" was two and a half years, and she believed she "can do it again." *Id.* at 96. Mother testified that she lives on a prison "recovery unit," where she attends and runs NA and AA meetings, as well as a mental health program called Double Trouble. *Id.* at 68-69. Mother stated, "I continue to work on my behaviors and work on myself." *Id.* at 69.

On cross-examination, Mother explained she lives in the "lock-up side" of the prison, but expected to transfer to the prison's diversionary rehabilitation program. *Id.* at 57. She indicated she would participate in outpatient drug treatment upon her release. *Id.* at 61, 92. Mother also stated that she still has her home, which her older son maintains while she is incarcerated. *Id.* at 65. She testified that once she is paroled, she plans to obtain employment with a temp agency. *Id.* at 66.

Regarding Child, Mother testified:

> I've had a relationship with him ever since I got out the last time [in 2019]. Like it's my baby. He's not a bad kid. He's in a bad situation, that's all. He's going through a lot for an eight year old.
>
> I'm sure he wants – any eight year old wants to be with his parents. I mean I understand things happen. I'm sure he do[es]n't want to be adopted. Like, he knows he's got to be where he's at ….

… [Child does not] want to be adopted. He knows he's in a safe place, and that's where he knows he's got to be and he wants to be there, but he also wants to come home. He loves [C.M.] and he loves [D.[7]] and he knows he's safe there …. He's eight. He also loves his mom …. [I]t's not fair to the little guy.

*Id.* at 79-80 (footnote added). Mother described Child as "emotionally … all over the place." *Id.* at 91.

Child's guardian *ad litem* advised that Child "does not want to be adopted" and "feels comfortable staying" in C.M.'s home. *Id.* at 99-100. She explained:

I don't think anybody at this hearing is happy to say that we want Mother's rights to be terminated, but knowing how difficult this time around has been for [Child] and believing that Mother's periods of sobriety while she is not incarcerated are approximately maybe 2.5 percent of Child's life, I just don't think [Child] should have to take that risk again.

He is not doing well, and part of that is he thinks it's going to get better. He thinks things are going to be fixed. If we send him back [to Mother] and he goes into [dependent] care for a third time, I'm not sure [C]hild will recover from that.

I think [C]hild will recover from being parented by his paternal aunt and having a relationship with his sober mother, and I think that can still happen even after termination or if termination happens. I am in agreement with the Agency's position.

*Id.* at 100.

Child's legal counsel relayed:

As it's been stated numerous times throughout these proceedings, for such a young man, [Child] carries a very heavy burden. He has a very real understanding of the situation he's in.

---

[7] Mother does not identify "D." and his relationship to C.M. and Child.

- 11 -

While he loves his aunt, he loves his cousins, he feels comfortable there, he likes it there, to him that's not home. When he thinks of home, he wants to be with his mom. During my discussions with him, and I would change the subject several times and come back, he was very adamant he wanted to go home. He wanted to be with his mom.

So he very much understands the consequences of being adopted and what that would mean. He does not want to be adopted. He does like his school. He has told me that. He sees a counselor there. He does enjoy spending time with his counselor. But at the end of the day, he wants to be with his mom.

I asked him … is there anything I can tell the judge that you want me to tell the judge. And he said, just ask the judge when my mommy is getting out of jail so I can go home. So I am not in agreement with the Agency's recommendation to terminate rights.

*Id.* at 100-01.

On March 23, 2023, the court entered a decree terminating Mother's parental rights, and an order changing Child's permanency goal to adoption with "the concurrent goal of placement with a legal custodian (relative)." Order, 3/29/28.

On April 27, 2023, Mother filed separate notices of appeal and concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). This Court consolidated the appeals *sua sponte* on May 17, 2023. On May 22, 2023, the orphans' court entered an order responding to Mother's concise statement and advising that "the basis for [the court's

decision] can be found in the Order and Opinion dated March 28, 2023."[8]

Statement Pursuant to Pa.R.A.P. 1925(a)(2)(ii), 5/22/23, at 1.

ISSUES

Mother presents ten issues for review. In the appeal at 635 MDA 2023, Mother presents the following seven issues challenging the termination decree:

> 1. Did the trial court err as a matter of law and/or abuse its discretion in finding the petition for involuntary termination of parental rights, filed by the Agency satisfied strict compliance with the legal requirements of the Adoption Act, where the petition did not set forth specific facts and therefore the trial court lacked jurisdiction to hear the petition?
>
> 2. Did the trial court err as a matter of law and/or abuse its discretion in taking judicial notice of records of another case and incorporating the record from the related dependency proceedings wherein evidence and documents contained within said record were admitted under a separate and distinct body of law (the Juvenile Act), contained documents admitted into evidence under a lower standard of proof, [were] not properly authenticated, and consisted of hearsay within hearsay with no exceptions presented?[9]
>
> 3. Did the trial court err as a matter of law and/or abuse its discretion in concluding that the Agency met its burden of proving, by clear and convincing evidence, that Mother's conduct evidenced a settled purpose of relinquishing her parental claim to [C]hild or

---

[8] The Rule states, "Upon receipt of the notice of appeal and the concise statement of errors complained of on appeal required by Pa.R.A.P. 905(a)(2), the judge who entered the order giving rise to the notice of appeal, if the reasons for the order do not already appear of record, shall within 30 days file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, which may, but need not, refer to the transcript of the proceedings." Pa.R.A.P. 1925(a)(2)(ii).

[9] Mother "acknowledges this issue is waived." Mother's Brief at 7.

has refused to perform parental duties, pursuant to 23 Pa.C.S. § 2511(a)(1)?

4. Did the trial court err as a matter of law and/or abuse its discretion in concluding that the Agency met its burden of proving, by clear and convincing evidence, that Mother's repeated and continued incapacity, abuse, neglect, or refusal caused [C]hild to be without essential care, control, or subsistence necessary for their physical or mental well-being, and the conditions and causes cannot or will not be remedied by Mother, pursuant to 23 Pa.C.S. § 2511(a)(2)?

5. Did the trial court err as a matter of law and/or abuse its discretion in concluding that the Agency met its burden of proving, by clear and convincing evidence, that the conditions which led to the removal and placement of [C]hild] continued to exist and Mother failed to remedy those conditions within a reasonable time, pursuant to 23 Pa.C.S. § 2511(a)(5)?

6. Did the trial court err as a matter of law and/or abuse its discretion in concluding that the Agency met its burden of proving, by clear and convincing evidence, that the conditions which led to the removal or placement of [C]hild continue to exist, and termination of parental rights would best serve the needs and welfare of [C]hild, pursuant to 23 Pa.C.S. § 2511(a)(8)?

7. Did the trial court err as a matter of law and/or abuse its discretion in concluding that the Agency met its burden of proving, by clear and convincing evidence, that the termination of Mother's parental rights would best serve the needs and welfare of [C]hild, pursuant to 23 Pa.C.S. § 2511(b)?

Mother's Brief at 7-9.

In the appeal at 632 MDA 2023, Mother presents the following three issues challenging the goal change order:

1. Did the trial court err as a matter of law and/or abuse its discretion by changing the court ordered goal despite the testimony of [M]other's efforts to comply with court goals while incarcerated?

- 14 -

2. Did the trial court err as a matter of law and/or abuse its discretion in accepting the report and testimony of the caseworker dispute [*sic*] undisputed testimony, including the caseworker's own testimony, on the Agency's failure to investigate their own concerns[?]

3. Did the trial court err as a matter of law and/or abuse its discretion when it changed the court ordered goal from reunification to adoption without clear and convincing evidence that a change of goal would serve the best interests of [C]hild?

*Id.* at 6.

### 635 MDA 2023

We first address Mother's issues pertaining to termination. We review the termination of parental rights for an abuse of discretion. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012).

[O]ur standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review …. [U]nlike trial courts, appellate courts are not equipped to make fact-specific determinations on a cold record, where trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual

- 15 -

findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*Id.* at 826-27 (some citations omitted).

The petitioner has the burden to provide clear and convincing evidence that its asserted grounds for termination are valid. *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009). The orphans' court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). Again, if competent evidence supports the court's findings, we will affirm even if the record could also support the opposite result. *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa. Super. 2003).

Mother first argues the Agency's termination petition was insufficient, because it did "not state any facts beyond those included in the initial adjudication order which would serve as sufficient allegations under any of the sections named." Mother's Brief at 35. Mother concedes she did not "specifically state" this objection before the orphans' court, but emphasizes her refusal to stipulate to the supplemental facts and allegations proposed by the Agency at the first day of hearing. *Id.* Mother implies she did not object to the petition because "Counsel's expectation was that the Agency would not be able to meet its burden." *Id.* at 36.

Mother cites our recent non-precedential decision in **In re P.G.D.W.**, 296 A.3d 638 (Pa. Super. 2023) (unpublished memorandum at 6),[10] where this Court vacated a termination decree and remanded the case for dismissal of the termination petition. We are not persuaded by Mother's reliance on **P.G.D.W.**

The disposition in **P.G.D.W.** was based on our determination that the termination petition "failed to strictly comply with Section 2512(b)(1) of the [Adoption] Act to allege even minimal facts to support the petition, [and thus] the court lacked jurisdiction to hear the petition." **Id.** (unpublished memorandum at 5). Pertinently, the mother in **P.G.D.W.** preserved the issue in a motion to dismiss the termination petition she filed weeks in advance of the termination hearing. **Id.** (unpublished memorandum at 2). The court denied the motion the following day. **Id.** Here, Mother's counsel "did not raise an objection with regard to the Petition or jurisdiction at the time of the hearing …." Statement Pursuant to Pa.R.A.P. 1925(a)(2)(ii), 5/22/23, at 2. It is well-settled that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." **Int. of N.B.**, 260 A.3d 236,

---

[10] Pursuant to Pa.R.A.P. 126(b), unpublished non-precedential decisions of the Superior Court filed after May 1, 2019, may be cited for persuasive value.

243 (Pa. Super. 2021) (citing Pa.R.A.P. 302(a)). Thus, Mother has waived this issue.[11]

Next, Mother "respectfully withdraws her second issue … with regard to incorporation of the record." Mother's Brief at 37. As indicated above, Mother concedes that she waived her second issue. *See id.* at 7.

In her remaining five issues challenging termination, Mother assails the orphans' court's analysis of evidence pertaining to Section 2511 of the Adoption Act. Under Section 2511, the court must engage in a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

_____

[11] Waiver notwithstanding, the orphans' court "submit[ted] that it had jurisdiction to hear the Petition." Statement Pursuant to Pa.R.A.P. 1925(a)(2)(ii), 5/22/23, at 2. The court found the Agency "complied with the requirements of 23 Pa.C.S.A. § 2512(b), including an extensive allegation of facts establishing the basis for terminating [Mother's] parental rights as required by § 2512(b)(1)." *Id.* at 1 (citation omitted). The court noted the petition "also includes an averment that the Agency will accept custody of [C]hild until such time as [C]hild is adopted, as required by § 2512(b)(2), with a consent … signed by the Agency solicitor attached to the Petition." *Id.* at 1-2 (citations omitted).

***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted).

Mother argues the orphans' court "abused its discretion when it granted the request for termination … [because] the Agency failed to present sufficient evidence … that Mother's rights should be terminated under § 2511(a) or that termination would be the best interest of the Child under § 2511(b)." Mother's Brief at 23.

The Agency counters that the orphans' court's decision was supported by competent evidence. Agency's Brief at 17. The Agency claims the conditions "which led to the placement, continue to exist," and Child "needs and deserves permanency, which Mother has failed to demonstrate that she can provide." ***Id.***[12]

Section 2511(a)  -  Grounds for Termination

In issues three through six, Mother argues the orphans' court erred in terminating her parental rights under Subsections 2511(a)(1), (2), (5), and (8). However, to affirm the termination of parental rights, this Court need only agree with the court's decision as to any one subsection of Section 2511(a). ***In re B.L.W.***, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Instantly, we examine Mother's claim under Subsection 2511(a)(2), which provides for termination when

> [t]he repeated and continued incapacity, abuse, neglect or refusal
> of the parent has caused the child to be without essential parental
> care, control or subsistence necessary for his physical or mental

---

[12] Child's guardian *ad litem* and legal counsel have not filed appellate briefs.

well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). The petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.* (emphasis added). Pertinently, the Pennsylvania Supreme Court has held

incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist under § 2511(a)(2), where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that the causes of the incapacity cannot or will not be remedied.

*Adoption of S.P.*, 47 A.3d at 828.

This Court has observed, "the fact of incarceration alone neither compels nor precludes termination of parental rights. Parents must still provide for the emotional and physical well-being of their children." *In re Z.P.*, 994 A.2d 1108, 1120 (Pa. Super. 2010). "The cause of incarceration may be particularly relevant to the Section 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were 'part of the original reasons

for the removal' of the child." *Id.* (quoting *In re C.L.G.*, 956 A.2d 999, 1006 (Pa. Super. 2008)).

Mother fails to develop a convincing argument regarding Section 2511(a)(2). *See* Mother's Brief at 47-50. Mother recites general case law and emphasizes that "incarceration alone" is insufficient to support termination. *Id.* at 48. Mother also revisits the evidence in her favor, and highlights Child's desire to live with her and not be adopted. *Id.* at 50. According to Mother, "there is insufficient evidence that termination … would serve the needs of the Child." *Id.*

In contrast, the orphans' court provides detailed reasoning for its conclusion that termination was warranted under Section 2511(a)(2). The court states:

> [Mother] is currently incarcerated at SCI Cambridge Springs. Testimony established that including her current incarceration, she's had a total of seven DUI convictions in her life.
>
> As a result of those DUI convictions during [C]hild's life, [Mother] has been incarcerated for a little less than seven years of [C]hild's eight plus years of life.
>
> Records established that [Mother] was incarcerated shortly after [C]hild was born in 2014, through February 1st, 2019, just under five years. She was reincarcerated for a subsequent DUI in June of 2021, and remains incarcerated at this time.
>
> The testimony established that [Mother] anticipates beginning the state drug treatment program at SCI Cambridge Springs in the next month or so. Testimony established that once she begins the program, she will need to be participating on site at SCI Cambridge Springs for a minimum of seven months, with that date having begun running on January 20, 2023.

- 21 -

As part of those seven months, [Mother] testified that four months of those would need to be in the specific state drug treatment program. She would then be required to participate in at least 60 days of rehab followed by six months of intensive outpatient treatment.

While this is Mother's stated plan, as [Child's] guardian *ad litem* addressed, it's not a guaranteed plan with a guaranteed end date. As the guardian *ad litem* addressed with [M]other in cross examination, it's anticipated that [Mother] will have completed the state drug treatment program, the two months of rehab, and six months of intensive outpatient, approximately next April, approximately one year from now, if she fully completes all aspects of that plan.

If [Mother] is unsuccessful in any way, then she has one and a half years remaining on her current incarceration and sentence that she would have to serve.

While the court certainly wants Mother to be successful in her participation in the state drug treatment program, along with the follow-up rehab[, and] along with the six months of intensive outpatient [treatment], her drug and alcohol history does not give the court any level of confidence that that will be the case and will allow her to move forward in properly parenting [Child].

If [Mother] completes the seven months while still at SCI Cambridge Springs and the rehab program, she would then need to establish herself through an intensive outpatient program for six months, including establishing steady employment.

Testimony established that [Mother has] housing to go to and that her residence is being maintained by her adult son who is residing in the home. Testimony established that he is on probation currently for a DUI as well.

The court certainly would be looking for Mother to complete a threat of harm evaluation prior to her being able to reunify fully with [C]hild, based on her lengthy substance abuse issues. As such, even in the best case scenario, assuming [M]other would be fully compliant with the state drug treatment program at SCI Cambridge, fully compliant with the 60-day rehab program, fully compliant with another six months of intensive outpatient treatment, and then being able to establish steady employment,

maintaining appropriate housing, and beginning re-engagement in a therapeutic manner with [Child], it would be, best case scenario, one to one and a half years minimum before she would be in even a possible scenario to have legal and physical custody returned to her.

The court would note that while incarcerated currently, Mother has participated in various programs, including [programs] related to mental health and substance abuse. She also testified that while [incarcerated in county prison] previously, she had done some parenting program[s].

The court also does acknowledge for the record that [Mother] has participated in phone calls and/or Zoom visits [with Child]. The court does note when asked a pretty basic question as to what efforts she has undertaken to regularly follow and be aware of [C]hild's education progress, including reaching out to [C]hild's teachers or other school officials, she acknowledged … she's not done so.

That in the court's view is a basic parental duty that even while incarcerated, a parent can fully engage in through technology such as email or scheduled phone calls. A parent while incarcerated can be proactive and not rely on others to update her about her child's education, but have direct input from the child's educators.

The court acknowledges that, as stated previously, [C]hild has a bond with [M]other and desires and hopes to reunify with [her]. While the court appreciates the argument by [Child's legal] counsel regarding [C]hild's hopes and wishes, that's not what governs the court's decision here today per the laws of this Commonwealth. It's whether [M]other has demonstrated the ability to move forward in a manner that will allow her to properly and safely parent [Child] and not have [him] remain in limbo with the hope of that occurring.

The court places heavy weight on Mother's lengthy substance abuse history, including seven DUIs, which does not, again, give the court any degree of confidence that she will be able to successfully complete her program, reunify with [Child], and continue to properly and safely parent [C]hild.

While the court would like to believe there is a hard end date for Mother being successful in her programs, that is clearly not the case today, and the court would concur with Mother's statements that, quote, it's not fair to the little guy.

What's not fair to the little guy … is that he's not had the opportunity to be safely and properly parented by his mother … for the majority of his life. He's been blessed by other family members, including his grandmother in the past and a paternal aunt currently, to be in a family setting where he's safe and well provided for and loved day in and day out.

So in conclusion, the court finds … [Mother cannot] provide a safe and appropriate setting for [Child] to be parented by [Mother]. It is unclear when, if ever, [Mother] will be able to do so in the future.

N.T., 3/28/23, at 112-17.

The record supports the orphans' court's conclusion that Mother's continued incapacity to parent Child has caused Child to be without essential parental care, and the causes of Mother's incapacity cannot or will not be remedied. *In re A.H.*, 247 A.3d at 443. Accordingly, the orphans' court did not abuse its discretion in terminating Mother's parental rights under section 2511(a)(2).

Section 2511(b) - Needs and Welfare

In her seventh issue, Mother challenges the orphans' court's termination of her parental rights under 23 Pa.C.S.A. § 2511(b). When the court finds grounds for termination under Subsection 2511(a), it must then consider Child's needs and welfare:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. ...

23 Pa.C.S.A. § 2511(b).

This Court has stated repeatedly that intangibles "such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id.* (citation omitted). However,

> **the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case**.
>
> Importantly, **the question is not merely whether a bond exists, but whether termination would destroy this existing, necessary and beneficial relationship**.

*In re A.H.*, 247 A.3d at 444–45 (citations omitted, emphasis added).

Again, Mother's argument is unpersuasive, as it consists primarily of citation to general case law, and refers to the evidence most favorable to Mother. *See* Mother's Brief at 55-59. The orphans' court explained it

> heard testimony as it relates to [C]hild's bond with [M]other … as well as [C.M.,] who currently ha[s custody of Child], and … while there is a bond with [M]other … termination of [Mother's] parental rights will not result in long-term negative impact on [C]hild. Rather, it will allow [C]hild to achieve permanency and move forward rather than remaining in limbo while his mother maintains only the possibility of properly parenting him in the future.

N.T., 3/28/23, at 109.

The court further found Child "has a very strong bond with his paternal aunt that is parental in nature, and while [Child], according to testimony and

advocacy of counsel, hopes to return to Mother's care, the court does not believe that is achievable in the foreseeable future." *Id.* at 117. Thus, the court observed:

> [A] pre-adoptive resource has been identified. However, the court does acknowledge that [C]hild has indicated at this time that he does not wish to be adopted. And so with the termination of Mother's rights, the ultimate path forward may be permanent legal custodianship with his kinship family versus adoption.
>
> The court believes that termination of [M]other['s] parental rights best serves [C]hild's needs and welfare, and, again, will allow him to achieve permanency.

*Id.* at 117-18.

Consistent with the evidence, the orphans' court acted within its discretion in considering Child's needs and welfare and terminating Mother's parental rights pursuant to Section 2511(b).

## 632 MDA 2023

Mother raises three issues challenging the goal change order. However, because we affirm the termination decree, the appeal from the goal change order is moot. *See Int. of A.M.*, 256 A.3d 1263, 1272-73 (Pa. Super. 2021) (finding issues regarding goal change moot in light of termination of parental rights); *In re Adoption of A.H.*, 247 A.3d 439, 446 (Pa. Super. 2021) ("the effect of our decision to affirm the orphans' court's termination decree necessarily renders moot the dependency court's decision to change Child's goal to adoption"); *see also In re D.K.W.*, 415 A.2d 69, 73 (Pa. 1980) (stating once parental rights are terminated, issues of custody and

dependency under Juvenile Act are moot).  Accordingly, we dismiss the appeal from the goal change order.  ***See, e.g., Int. of M.S.-L.***, No. 2348 EDA 2022, 2023 WL 3613309, at \*5 (Pa. Super. May 23, 2023).

Decree affirmed at No. 635 MDA 2023.  Appeal dismissed at No. 632 MDA 2023.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/10/2023